All rise. The judges of the Bankruptcy Appellate Panel. Hear ye, hear ye. The Bankruptcy Appellate Panel of the Sixth Circuit is now in session. All persons having business before this honorable court, draw near, give attention, and ye shall be heard. God save the United States and this honorable court. Please be seated. Good morning. The clerk may call the case. Case number 19-8005. N. Ray, Chieftain Steel, LLC, et al. Debtors. Dinsmore & Scholl, LLP, et al. Appellants v. United Cumberland Bank Appellee. Oral argument not to exceed 15 minutes per side. Mr. Miller, for the appellants, you may proceed. Good morning, your honors. Mr. Backert, and may it please the court. My name is Kyle Miller. I represent the committee professionals in this action. I'd like to argue for 10 minutes and reserve 5 minutes for rebuttal, at which time Ms. Kennedy will rebut the creditor's arguments. The Sixth Circuit has explicitly held that carve-outs are earmarked for the exclusive benefit of the Chapter 11 bankruptcy professionals. As is typical in many Chapter 11 cases, the professionals in this case negotiated and agreed to a carve-out with the debtor's secured creditor, UCB. What's not typical is after the reorganized debtor was forced into a Chapter 7 proceeding, UCB began collecting on its liens that it made subject and subordinate to the professionals' fees, ignoring the carve-out itself. The bankruptcy court erred when it held that though the professionals were entitled to their fees, they could not look to UCB for satisfaction of those fees. To be clear, the professionals are only looking to UCB because it has collected on sums for liens which are subject and subordinate to the professionals' fees. We believe this court should overturn the bankruptcy court for four different reasons. First, the explicit language of the carve-out prevents UCB from retaining these sums. Second, there's a strong. Let me ask a quick question in that regard. Cash collateral order says that the funds we're talking about are funds that are available as funds permit without causing an overdraft. Your interpretation seems to indicate that it's a guarantee of $20,000 times two, $40,000 a month, regardless of whether funds permit it or not. So how do we accept your interpretation without totally ignoring that sentence? Thank you, Your Honor. The cash collateral order does provide for that, that the debtor can pay as funds become available. Unfortunately, the funds were not available. But the cash collateral orders also say payment of any amounts on account of the post-petition replacement liens, the UCB pre-petition indebtedness, and the UCB pre-petition liens shall be subject and subordinate to the carve-out. Can you define carve-out as you understand? Because I think that's what part of the issue is, what you thought the carve-out was. Was it the sum of money? Was it just the total fees? How are you defining carve-out? Yes, Your Honor. The carve-out was the $20,000 for the debtors' professionals, Densmore and Scholl, and to be divided between the committee professionals per month during the time those 13 cash collateral orders were in place. Regardless of whether or not there were fees sufficient to pay. That's correct, Your Honor. And I think that was the understanding of all parties, including the bankruptcy court in this action. And that's reflected in the fact that at the time of plan confirmation, the carve-out clearly had not been paid month to month, and yet the plan references the full amount that the professionals can be paid if funds are available from the carved-out amount or otherwise as the debtor has on hand. Excuse me, but doesn't the plan contemplate that the payment will be first from the monies that were escrowed? Yes, Your Honor, it does. And the escrowed funds were not sufficient, if they were there at all, to pay the professionals in this case. First from the — Then who was supposed to pay? The debtor, Your Honor. And the debtor was unable to because second as the debtor has it available. So if that's what was intended, why didn't the plan say first from the escrow, second from the debtor to the extent available within 45 days, and third from the bank? It only says first and second. It doesn't say what to do if there's not enough money. That's correct, Your Honor. But nowhere in the plan does it give UCB the right to jump the professionals' priority in this case. In fact, the plan says that UCB's existing liens shall be deemed in full force in effect. And the liens that were existing at the time of plan confirmation were subject and subordinate to the professionals' carved-out fees. If that's right, why didn't the plan acknowledge liens of professionals instead of vesting all the property in the debtor free and clear of all liens except for the existing bank liens? I think that the liens in the plan were incorporated because the UCB's liens, it said only that they have existing at the time, are in place and deemed in full force in effect. Obviously, part of what the bankruptcy court was doing was looking for the explicit language that I think we're searching for here. But courts from Licking River, also in U.S. Flow, also in MolliCorp, when they searched cash collateral orders, they were looking for limiting language and finding none interpreted those orders broadly to find that the professionals could find relief. So it's a matter of contract interpretation or interpreting the orders? It is a matter of contract interpretation, Your Honor. What is the standard of review under those? And why? In Ray Licking River tells us that when we're viewing the way the bankruptcy court interprets their orders, it is an abuse of discretion standard. But when you look at the contract as a whole, you review that de novo. So I believe that you can look at the different. How would you articulate the difference between those two things? The contract as a whole would be as articulated in the bid orders? In the cash collateral orders and the plan, Your Honor. So the articulable difference is that, obviously, the abuse of discretion standard gives high deference to the bankruptcy court. But to the extent you're looking at all the agreements as a whole and the action of the parties, I believe you can review that de novo. In terms of the interpretation of the contract under whatever review, your interpretation would indicate that the cap of the $20,000 or $40,000, depending on how you look at it, is not really a cap, it's a minimum, correct? In other words, is there any scenario where, under your interpretation, it could have been $10,000 or $5,000 based on the funds available? Or is the cap language meaningless because it was a guarantee of the full amount? No, Your Honor. I don't think the cap language is meaningless because, and for that, we have to look at the professional's fee applications and the approved professional's fees. So the professionals in this case were approved for fees in excess of the carve-out, and the bankruptcy court could have approved fees under the carve-out. Because they were approved in excess of the carved-out amounts, then the debtor should be able to look to the secured creditor, who has already collected on those subordinate liens, for only up to the carved-out amounts. But you're saying the maximum only ties into allowed fees. The maximum has nothing to do with the actual existence of cash collateral. Your Honor, I'd like to clarify. I believe that it does relate to the existence of allowed fees, if appropriately worked and approved, and that it is related to cash collateral, but when the order makes their pre-petition and post-petition replacement liens subject and subordinate to the carve-out, then we're not looking at the specific cash collateral at the time, such as adequate assurance, but all of UCB's rights vis-à-vis their securities. Including non-cash collateral? Equipment or something else that's not cash collateral? Yes, Your Honor. And I think In re Licking River supports that interpretation, where the debtor was placed into a Chapter 7. It was liquidated. The Court explicitly references sums collected through the liquidation that were added to the Chapter 7 estate, and they said those sums are exclusively earmarked for the bankruptcy professionals from the Chapter 11 proceeding. But wasn't that because they were contemplating the liquidation? The parties actually were making sure that the language was included addressing that probability. Your Honor, I don't think there's anything that says that there should be explicit language that obviously contemplates that. First, that any carve-out is there to protect against liquidation. The whole purpose of the carve-out is so that if the debtor becomes insolvent, that the professionals are protected. Secondly, I think we actually do have that language in the carve-out. The Court in Licking River specifically cited to the words that it could be paid at any time. And in Paragraph 5 of the carve-out, it does say, it does, in our carve-out, we do have that UCB's liens subject to the carve-out are in force at any time. So I think that we actually have that here. All right. Thank you. Time's up. Thank you, Your Honors. Counsel. May it please the Court. My name is Scott Backert from Bowling Green, representing the Appleby United Cumberland Bank, which was the principal secured creditor in the Chieftain Steele case. We believe that the bankruptcy court decision in this case is not going to, as been suggested in the brief, hamper reorganizations or spur disputes in the future that would compromise the effective administration of the bankruptcy process, as the appellants have suggested. I think the impact of this particular decision by Judge Lloyd is probably limited just to the facts in this case because of the way the cash collateral order was written and limited, and more importantly, by the way that the plan of reorganization was written and the language that clearly was missing to achieve the result desired here. Not to blow this case out of proportion, but if there is a cautionary tale, it is a warning to the parties and counsel that if professionals are going to look to the secured creditor to pay fees, that that language should be clear and unambiguous. I think that's especially true in this case, considering the nature of the facts. We must remember that there were actually two debtors in this case who filed at different times but were subsequently administratively consolidated. Chieftain Steele, for whom the professionals were debtors' counsel and committee counsel, but then the companion company, Floyd Industries, which is not at issue here today. Those professionals have not made any sort of claim over and beyond what they have been paid. In the plan, it was anticipated that those two entities post-confirmation would merge and that a new reorganized debtor, the Penny Ryle Company, would emerge, such that now what pre-confirmation assets belong to the two companies have now been consolidated. We have this issue arising eight months later when an involuntary petition is filed, so we now have accounts receivable inventory that belong to the reorganized debtor post-confirmation. So we have all of these assets that are now, in essence, co-mingled between post-confirmation, pre-confirmation, two debtors merged into one entity. Because of the nature of those facts and the anticipated merger, there needed to be, in the order of confirmation or in the plan of reorganization, much more unambiguous and clear language as to how the attorney's fees were going to be handled. Counsel? Yes. The plan refers to UCB's existing liens. What does that term mean? As I interpreted and understood it at the time, that that would have applied to the pre-filing liens, as referenced in the cash collateral order, and then the post-confirmation liens that were extended as part of the cash collateral order that carried through the case and then subsequently carried through confirmation. Pre-confirmation were the bank's existing liens subordinate to some extent to the committee and debtor professionals? Pre-confirmation, to some extent, they would have been. Subject to the requirement, excuse me, that there would not have been an overdraft created each month under the budget. It was that $20,000 amount was part of the budgeting process, determining what the debtor could afford on a monthly basis so as not to create any sort of overdrafts, which would have impaired further the bank because not only were we the secure creditor, we were the depository for the account. So clearly we wanted to limit risk of the debtor operating in the red. You may need to move that mic back up a little bit so the recording picks it up. I need to move it to the other side where I don't swing my hand so much. Were the funds being set aside or were you contemplating that to the extent of cash collateral, you would be required to make sure that that $20,000 would be available for a fee? No, it was never the thought of the bank that it would have any responsibility or any need to segregate these funds. It was anticipated, as the order says, that the debtor shall pay this money so long as the debtor does not create an overdraft. Did the debtor do that? It is my understanding, yes, that there was monies that were paid from time to time pre-confirmation, thus the reference to the fact that money was held in escrow. And I know from other reporting, even post-confirmation, the debtor paid additional fees, although not as much as was awarded by the court. It is the position of the bank that the plan of realization is the operative document and the new contract that needs to be interpreted de novo, I believe. I think the court has to give deference to the extent that Judge Lloyd interpreted her orders, the cash collateral order and the order of confirmation, but I think the contract itself, as I understand the law, would be a de novo review. And I think, Judge Bashburn, you asked the right question. Should there not have been follow-up language or additional language in the order of confirmation? There are plenty of opportunities in this order to clarify that the carve-out would continue or that the creditor was going to be subject post-confirmation to some responsibility. Clearly, paragraph 3.5 that dealt with the professional fees could have had the third provision. If the debtor did not pay, the creditor would have had the responsibility to pay those over. 4.2, which revests the assets or revests into the bank its lien. Language could have been added that that was subject to the carve-out. That language is missing. The provisions in 75 that assets were revested in the debtor could have also contained a provision subject to the carve-out. That language is not there. There is a paragraph where United Cumberland Bank receives release of various claims. Language could have been added just to clarify that nothing herein shall be construed a release of the obligations under a cash collateral order. Certainly, all of that should have been in the plan so that that responsibility on the creditor could have been taken into consideration when we decided whether or not to vote on the plan. Now, I think to some extent that this argument has only arisen because the debtor has been placed into an involuntary bankruptcy because the court only needs to look at the conduct of the professionals post-confirmation to see how they really interpreted the order. If the order says what they wanted to say, that they were to be paid within 45 days, I would have expected that some demand would have been made upon the bank before or immediately after that 45-day period to pay over what they were entitled to under the carve-out. In the professional fees order approving for the committee, which was in August after confirmation, I think it's docket number 303, the debtor and the professionals for the committee outlined a payment scheme where the debtor was going to pay the professionals in eight installments beginning September 1, 2017. No reference to the obligation of the bank to make any payments. When the debtor defaulted on that order, demand was made by the professional's attorney to the debtor. No demand was made upon the secured creditor for payment at that time. The first time that any sort of demand was made was when three days after the involuntary petition was filed, including one of the petitioning creditors being counsel for the creditor's committee. Is this information in the record before us? Yes, it is. I would also like to point out, too, that the cash collateral order, the way it is written, I do not believe achieves the results that the professionals want to achieve. Clearly, the bankruptcy court put emphasis on the language that the debtor may pay the carve-out funds without overdraft. I think that was significant limiting language in the decision of Judge Lloyd. It should also be noted that there was no provision in these orders to address the situation of what if the debtor was unable to pay these under the cash flow. There was no provision that if the debtor could not pay the $20,000 or $40,000 in any given month, that the shortfall carried forward to the next month. There was no provision that if the debtor was unable to pay the monies allowed under one order, that those funds carried forward to a subsequent cash collateral order. So your argument is that each order was a discrete order and that that amount just took care of that period of time. I believe that was certainly our intent, and that's why I believe how the order has got to be interpreted with that limiting language is they were entitled out of the current cash flow, $20,000 a month to be set aside in escrow pending approval of the fees. Is that a reasonable interpretation given that under the totality of circumstances, the professionals would be continuing to work? Excuse me. And although they could be doing time accounting, what ultimately the fees to be allowed wouldn't be known until later. And so under your interpretation, it seems to lead to looking at work that was done and reallocating it to make sure that you get your $20,000 as opposed to reading them all together to make sure the $20,000 is accumulating and running. If I understand the question. I think that it was the intent of the parties that the debtor would make these payments and the professionals would escrow that pending the approval. It was never intended to be a cap on the total amount of professional fees that could be sought, only a cap on the amount that could be charged as against the secured creditors collateral. So you would have known then at the beginning, depending on how long the case ran, that your collateral would be carved out to the extent of $20,000. Why does it make sense to limit that in a particular month if the fees didn't go there? You're anticipating that $20,000 amount into your collateral. So why say for one month, if the fees got up to $10,000, limit it to the $10,000, as opposed to if it's $10,000 one month and $30,000 the next month, allowing the professionals to still have the benefit of that extra $10,000? Because there's no loss there because you contemplated it when you set the limit. So why should we interpret it to be $20,000 just in that period of time, and then the professionals would potentially lose the benefit of the value of the work that they did just because in that particular month it exceeded their cap? Well, I don't think it's a question of whether they have lost the value of the work, because the amount over and above is subject to still being paid by the debtor or from assets other than the collateral of the bank. This merely serves as a limit as to what extent the bank's collateral could be surcharged for a monthly basis, taking into consideration the current cash flow of the debtors at that time. That's, frankly, how much we thought the debtor could stomach without causing the bank the potential of having to deal with an account that was going to overdraft. When you refer to surcharging the bank's collateral, are you referring to the entire collateral package or just the bank's cash collateral? I think it's just the cash collateral package. During each term of the order? During each term of the order and certainly coming to an end upon confirmation. I think the plan of confirmation in this case or the plan of realization that's confirmed is the factor that has been decided, particularly Living River. All of those typically dealt with a conversion to a Chapter 7. There's no intervening plan. There is no document that becomes res judicata as to the rights of the parties. I think the court has to give the plan of realization its full force in effect, recognizing that that becomes the new contract and should have been clear and unambiguous. I recognize that all lawyers like to get paid and certainly I understand and have been there, but as one lawyer once told me, representing debtors is like doing contingency fee work without the upside. But absent a clear and convincing agreement, the bankruptcy court could not create a contract between the bank and the professionals where the loan did not exist. Thank you. Thank you, Your Honors. Thank you for this opportunity to hear our arguments. My name is Ellen Arvin-Kennedy and I represent the law firm Densmore & Scholl with my colleague Kyle Miller representing the professionals as a whole. As a quick response to some of the questions that Your Honors have asked to date, one of which is why not recognize the liens of the professionals in the plan? I'd first state that the plan does recognize and anticipate that the fee applications or final fee applications had not been filed or approved. So stating some certain in the plan that would create and intentionally put a lien against those specific sums would not be appropriate in light of the fact that the fee applications had not yet been filed. But more to the point, the plan does allow the existing liens of the lender, and the existing liens of the lender in no way can one read those liens without reading the language that they are subject to the carve-out that was negotiated in the cash collateral orders. Your Honors made a good point that one cannot, and a law firm cannot, practically work $20,000 a month and stop until the next month. There is an expectation that that carve-out will be applied toward their final fee. And to make sure that it's clear, there is a cap, and that cap is the $20,000 a month through the duration of that case. That cap has been mathematically calculated, and some of the professional fees that have been approved and authorized for payment by the court are in excess of that cap, and the professionals are not seeking payment from UCB on those funds. They are simply seeking that UCB pay to the professionals the proceeds, first proceeds of the liquidation of the collateral that they have proceeded to do. And I submit that the professionals were appropriate in their follow-up in seeking those funds, both from the debtor and from UCB. Mr. Backert makes several arguments saying that, in his opinion, a case like this or a decision like the underlying bankruptcy court's decision would not hamper the reorganization process. And as a professional who is in this spot, I can certainly say that I believe that it does. As the court recognized in Licking River and as other courts have recognized in different cases that have been cited in our papers, a carve-out provides a guarantee and assurance for professionals that the good work that they do to serve their clients will be paid, or at least some portion of those funds will be paid. Excuse me, but if you use the term guarantee, if that's what was really intended, why didn't the professionals ask for that or get that from the bank? It says payment to UCB is subordinate to payment of funds each month. It doesn't say anywhere that the lien is subject to a lien being granted to the professionals. It doesn't use the word guarantee anywhere. In other words, you're wanting us to interpret carve-out as having some unique meaning that has nothing to do with the actual terms of the cash collateral order of the plan, aren't you? Well, Your Honor, I use guarantee in the more common parlance, meaning assurance, that there would be some assurance that there would be a source of funds. It was understood. I'm sorry, Your Honor. I'm sorry. I'm trying to interrupt you. The source of the carve-out, though, is contractual, is it not? The source of the carve-out is contractual between the professionals and UCB. So not all carve-outs are the same? Not all carve-outs are the same, Your Honor. And in response to the questions that Your Honors collectively have asked in terms of documentation and whether the debtor or the other professionals had appropriately documented that in the plan, Your Honor, the professionals submit that they did. The secured lender was only allowed their claims by virtue of the subject-to-carve-out language. There is a reference of the carve-out in the plan. UCB voluntarily and irreversibly subordinated its liens to the professionals for a capped amount in that cash collateral order. It was a final order. It was subject to the carve-out, and UCB at all times, having this lien, would be subject to that carve-out. The plan allowed for their existing liens. It did not amend the cash collateral order. It did not include UCB as a released party. It did not contain a release of UCB by the professionals, and it did reference payment to the professionals from the carve-out. And then after the plan was approved, the professionals submitted their fee applications, referencing the carve-out, orders approving their fees, referenced payout from the carve-out, which is completely inconsistent with the underlying court's decision that the plan effectively negated the carve-out because post-confirmation orders referenced payment from that very contractual right. So your argument is basically that the $20,000 should have continued to be rolled over. The fees after they have been finally applied, UCB should be subject to each $20,000 limit, and then whatever funds were available after the debtor paid, UCB has to come in and make good on that because they agreed to set aside, subject their lien to the $20,000, and that it would be worthless language to reference those orders in the final plan confirmation order if that was not the intent of all the plans. Your Honor, that's correct. And there is a cap, and there is a stopping point. And we are only seeking those monies that have been recovered from the proceeds of sale of debtor collateral. We are not asking UCB to come out of pocket, per se, to pay these fees. The point of the carve-out is to protect professionals in cases like this, and it is for these reasons that the bankruptcy court's order denying the motion to compel payment and turnover should be reversed. Thank you for your time. Thank you for your arguments. The case will be submitted. This honorable court now stands adjourned.